## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Nov 06 2017, 9:48 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Edgar
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

S.J. & T.J., III and U.J. (Minor Children),

And

T.J., Jr. (Father)

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

November 6, 2017

Court of Appeals Case No. 49A02-1706-JT-1200

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Larry E. Bradley, Magistrate

Trial Court Cause No. 49D09-1608-JT-932, 49D09-1608-JT-933, 49D09-1608-JT-934

**Altice, Judge.**

## Case Summary

T.J., Jr. (Father), appeals following the termination of his parental rights to his three children. On appeal, Father argues that the evidence was insufficient to support the termination of his rights.

We affirm.

## Facts & Procedural History

Father and E.J. (Mother)[1] had three children together: S.J, born in 2009; T.J., III, born in 2010; and U.J., born in 2011 (collectively, the Children). The family first came to the attention of the Department of Child Services (DCS) in April 2011 due to a report of abuse and/or neglect. Mother and Father entered into a six-month period of informal adjustment, pursuant to which Father was ordered to participate in services including a drug and alcohol assessment and random drug screens. DCS filed a petition for rule to show cause in that case on July 27, 2011, which resulted in a three-month extension of the informal adjustment. The informal adjustment was closed successfully on January 12, 2012.

---

[1] Mother consented to the adoption of the Children and does not participate in this appeal. Accordingly, our recitation of the facts is limited to those pertinent to the termination of Father's parental rights.

[4] Just three months later, DCS removed the Children, placed them in foster care, and filed petitions alleging the Children were Children in Need of Services (CHINS). Father waived fact-finding, and the Children were adjudicated CHINS based on Mother's admission that she had been arrested and charged with operating a vehicle while intoxicated and two counts of neglect of a dependent, and a no-contact order had been entered prohibiting her from having contact with the Children. A dispositional order was entered on June 14, 2012, pursuant to which Father was ordered to maintain suitable, safe, and stable housing, secure and maintain a legal and stable source of income, abstain from using alcohol or illegal drugs, complete a substance abuse assessment and all recommendations, submit to random drug screens, engage in home-based counseling, and attend all scheduled visits with the Children.

[5] Father failed to appear at the court's September 20 and December 20, 2012 review hearings, and Father's attorney indicated that he had not been able to contact Father. Father again failed to appear at a March 28, 2013 review hearing, and the CHINS court found that Father had failed to comply with the Children's case plan. Mother, on the other hand, had complied with the case plan and been reunified with the Children. The trial court concluded that the circumstances giving rise to the Children's supervision had been alleviated and therefore terminated DCS's wardship.

[6] The CHINS case giving rise to the current termination case began in April 2015, when DCS filed a CHINS petition after Mother abandoned the Children with Father at St. Vincent's hospital, where he was hospitalized in the

psychiatric ward. Father indicated at that time that he did not have housing and was unable to care for the Children. The Children were again removed and placed in foster care. The Children were adjudicated CHINS on May 28, 2015, based on Father's admission and agreement to participate in services. Father was ordered, among other things, to participate in home-based therapy and case management, to attend supervised parenting time with the Children, and to sign any required releases to allow DCS to monitor his compliance.

[7] DCS filed petitions to terminate Father's parental rights to the Children on August 8, 2016, and an evidentiary hearing was held on April 24, 2017. Evidence presented at the termination hearing established that Father failed to stay in contact with DCS and service providers and that his participation in services was sporadic and incomplete. Home-based case manager Richard Brooks supervised Father's parenting time with the Children and provided Father with services to help him obtain housing, employment, and mental health treatment. Brooks testified that Father appeared to be overwhelmed and sometimes agitated, and Father cancelled several parenting time sessions. Additionally, because Father had no stable residence, Brooks had no way to reach him unless Father contacted him first. Brooks terminated services in March 2016 due to Father's lack of contact and inconsistent participation.

[8] Father received mental health treatment at Cummins during the CHINS case, although his participation was inconsistent and ended altogether in March 2016. Although Father signed a release, DCS was unable to obtain Father's treatment records from Cummins. Father testified that he had been treated for

depression and was prescribed medication, but had stopped taking his medication in 2016 without informing his treatment providers after seeing a news report about prescription medications and drug abuse. Thereafter, Father treated his depression by "[r]eading." *Transcript Vol. 2* at 25. Father testified that he had also begun monthly therapy sessions at Midtown in January 2017, but he had not informed DCS. Father could not recall whether he had been hospitalized for mental health treatment during the CHINS proceedings.

[9] Additionally, Father testified that he was homeless when the CHINS case began and that he had been homeless at other times since. At the time of the termination hearing, Father had been living in a one-bedroom apartment for a little over a year and had worked at a retail store since January 2017. Father did not contact anyone from DCS to ask them to come and see his apartment.

[10] Family Case Manager (FCM) Erma Watson testified that Father initially kept in regular contact with her, but had only contacted her one time since March 2016. FCM Watson testified that Father has "gone back and forth" on whether he is able to care for the children, sometimes stating that he cannot handle parenting. *Id.* at 83. FCM Watson testified further that Father's parenting time was never suspended by the court, but Father never requested parenting time again after DCS's referral for supervised visitation closed in March 2016 due to Father's lack of participation. Father was not referred for additional services after that date due to his lack of contact. Father had seen the Children only one time during the year preceding the termination hearing.

[11] At the conclusion of the termination hearing, the trial court took the matter under advisement. On May 8, 2017, the trial court issued its order terminating Father's parental rights. Father now appeals.

## Discussion & Decision

[12] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[13] The trial court entered findings in its order terminating Father's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[14] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[15] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[16] Father first challenges the trial court's findings as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the trial court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in the Children's removal or continued placement outside Father's care will not be remedied and that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in the Children's removal or continued placement outside Father's care will not be remedied.

[17] In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial

probability of future neglect or deprivation of the child. *Id.* In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. Moreover, the failure to exercise parenting time demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Lang*, 861 N.E.2d at 372 (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)) (alteration in original).

[18] The trial court found in relevant part as follows:

> There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their father who was unsuccessfully discharged from services and out of contact instead of demonstrating whether he can provide for his children and be attentive to their behavioral issues, although given adequate time to do so. [Father] has demonstrated h[e] is unable or unwilling to be a full-time appropriate parent.

*Appellant's Appendix Vol. 2* at 43.

The trial court's finding in this regard is well-supported by the evidence. Father failed to stay in contact with DCS and his home-based case manager, resulting in the closure of his service referrals. Father never contacted DCS to restart services or reestablish parenting time, and as a result, he saw the Children only once in the year preceding the termination hearing, when he accompanied his mother during one of her unsupervised visits with the Children. Additionally, FCM Watson testified and the trial court found that Father's one-bedroom apartment would be inadequate for Father and all three Children, and Father's arguments to the contrary are nothing more than requests to reweigh the evidence. Father's lack of contact with DCS and service providers, his failure to participate in services, and his failure to exercise parenting time all demonstrate that he is unwilling or unable to take the steps necessary to be an adequate parent to the Children. The trial court's finding that there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside Father's care will not be remedied is not clearly erroneous.

Father also challenges the trial court's finding that termination of his parental rights is in the Children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-

child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[2] We have already concluded that the evidence is sufficient to support the trial court's finding that the conditions resulting in the Children's removal and continued placement outside Father's care will not be remedied. We note further that FCM Watson and the Children's guardian ad litem both recommended termination of Father's parental rights. This is sufficient standing alone to support the trial court's finding that termination is in the Children's best interests. We note further, however, that the Children have been in their respective foster placements for almost three years. S.J. and U.J. have been placed together in the same foster home, and while T.J., III has been placed separately, the foster parents are in close contact and the Children all see each other every other weekend. The Children are doing well in their foster placements, their significant developmental and behavioral needs are being met, and their foster parents wish to adopt them. The trial court's finding that

termination of Father's parental rights is in the Children's best interests is not clearly erroneous.

[3] Judgment affirmed.

[4] Baker, J. and Bailey, J., concur.